# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

SHEPHERD INVESTMENTS
INTERNATIONAL, LTD.,
        **Plaintiff,**

    **v.**                              **Case No. 03C0703**

VERIZON COMMUNICATIONS INC.,
        **Defendant.**

---

## DECISION AND ORDER

Plaintiff Shepherd Investments International, Ltd. ("Shepherd"), an arbitrager, brings this action alleging that defendant Verizon Communications Inc. ("Verizon Communications") falsely represented that it intended to go through with an agreement to merge with Northpoint Communications Group, Inc. ("Northpoint"), a provider of digital subscriber line ("DSL") services.[1]  Plaintiff contends that defendant violated Wis. Stat. § 100.18 (unfair trade practices) and Wis. Stat. § 551.41 (securities fraud), breached a contract and committed the torts of intentional, negligent and strict liability misrepresentation.  Before me now is defendant's motion to dismiss plaintiff's second amended complaint ("Compl.") for lack of personal jurisdiction and failure to state a claim on which relief may be granted.

---

[1]DSL is "[a] system that provides subscribers with continuous, uninterrupted connections to the Internet over existing telephone lines."  McGraw-Hill Dictionary of Scientific & Technical Terms (6th ed. 2003).

# I. SUBJECT MATTER JURISDICTION

In July 2003, the original plaintiff, Staro Asset Management LLC ("Staro"), brought this action against defendant. I had subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because the parties were diverse and the amount in controversy exceeded $75,000. All members of Staro were Wisconsin residents. See Cosgrove v. Bartolotta, 150 F.3d 729, 731 (7th Cir. 1998) (stating that the citizenship of a limited liability corporation is deemed to be the citizenship of each of its members). Defendant is incorporated in Delaware and has its principal place of business in New York. See 28 U.S.C. § 1332(c)(1) (stating that corporations are citizens of both their state of incorporation and the state where their principal place of business is located).

However, Staro alleged that it brought the action on behalf of Stark Investments Limited Partnership ("Stark") and Shepherd. Fed. R. Civ. P. 17(a) requires that "[e]very action shall be prosecuted in the name of the real party in interest." Thus, in May 2004, pursuant to Fed. R. Civ. P. 17(a) & 21 and with the parties' agreement, I ordered that Stark and Shepherd be substituted as plaintiffs for Staro.

This substitution destroyed diversity because some of Stark's limited partners were citizens of New York and Delaware. See Ind. Gas Co., Inc. v. Home Ins. Co., 141 F.3d 314, 316 (7th Cir. 1998) (noting that general and limited partnerships are citizens of every jurisdiction in which any partner is a citizen); see also Hoosier Energy Rural Elec. Co-op, Inc. v. Amoco Tax Leasing IV Corp., 34 F.3d 1310, 1314-15 (7th Cir. 1994) (stating that diversity must be "complete," meaning that no plaintiff may be a citizen of the same state as any defendant). In order to preserve diversity, Stark voluntary dismissed its claims under Fed. R. Civ. P. 41(a)(2).

2

Thus, the only remaining plaintiff is Shepherd, an entity incorporated under the laws of the British Virgin Islands. I have subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) because Verizon is a "citizen[ ] of a State" and Shepherd is a "citizen[ ] or subject[ ] of a foreign state," and the amount in controversy exceeds $75,000. See J.P. Morgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd., 536 U.S. 88 (2002) (stating that a corporation organized in a foreign state is deemed to be a citizen or subject of such state).

## II. FACTS

Defendant is a holding company. The primary business of a holding company is to hold a controlling interest in the securities of other companies. Merriam-Webster's Collegiate Dictionary (10th ed. 1999). Defendant holds a controlling interest in numerous subsidiaries. Defendant's subsidiaries provide telecommunications, DSL and related products to consumers. Defendant does not sell consumer products. Rather, its principal function is to raise capital by selling stock. Defendant uses the capital for a variety of purposes including acquiring other companies and financing activities of its subsidiaries. In recent years, defendant has sold much stock. In 2004, it paid over $4.3 billion in dividends to shareholders and was one of thirty companies comprising the Dow Jones Industrial Average.

In 2003, defendant had approximately 15,000 shareholders in Wisconsin. Approximately four times a year, defendant sent solicitations to each of its Wisconsin shareholders requesting that they purchase more of its stock. As a result of these solicitations, many of defendant's Wisconsin shareholders purchased additional stock.

3

Defendant also sent approximately six other mailings a year to its Wisconsin shareholders. Defendant included in these mailings materials such as dividend checks, annual meeting packets, tax forms, and information about itself. In one mailing, defendant requested that its Wisconsin shareholders contact their representatives in Congress and ask them to support a proposal to reduce taxes on dividend income because "Verizon already pays taxes on this income." (Hernandez-Malaby Aff. Ex. 2.)

In each quarter, defendant deposited approximately 1,400 dividend checks in some 140 Wisconsin banks.

Defendant conducted quarterly conference calls in which Wisconsin financial analysts and institutional investors participated. In these calls, defendant discussed its quarterly financial results. Through such calls, defendant spoke to Wisconsin professionals such as Stark, Northwestern Mutual, Broadview Advisers, Artisan Partners, Nicholas Applegate, Robert W. Baird, Strong Capital Management and the Marshall Fund.

Defendant also operated an interactive web site that included a Direct Invest Program, by which Wisconsin investors could purchase stock. The website stated: "Build your ownership systematically by reinvesting dividends and by making additional investments . . . Access your account online to review and manage your investments . . . Protect your Verizon Communications stock certificates by turning them in for share safekeeping at no cost . . . Establish an IRA that invests in Verizon Communications shares." (Hernandez-Malaby Aff. Ex. 2.) Some Wisconsin residents purchased defendant's stock through this program. Defendant's website also enabled Wisconsin residents to request investment information, and defendant fulfilled such requests by mail, fax or telephone call.

4

In December 1999, the Wisconsin Department of Financial Institutions ("DFI") granted Verizon, Inc., a predecessor of defendant, a certificate to do business in Wisconsin. In March 2000, Verizon, Inc. changed its name and gave up its right to transact business in Wisconsin.

In July 2003, defendant intervened in a suit in Dane County Circuit Court.

At and prior to the time plaintiff commenced suit, defendant employed lobbyists who lobbied the Wisconsin legislature and state administrative agencies. In its filings with the Wisconsin Ethics Board, defendant stated that it, "Verizon Communications," employed lobbyists who lobbied concerning: "All areas affecting the operation of Verizon and its subsidiaries." See, e.g., Wis. Ethics Bd., Organizations Employing Lobbyists in 2001-2002, available at http://ethics.state.wi.us/scripts/2001Session/OEL2001.asp?prinID=2709. Defendant's filings also indicate that it had a Wisconsin contact concerning its lobbying activities, its "Government Affairs – State Director," who worked out of an office at 100 Communications Drive, Sun Prairie, Wisconsin. (Id.) According to its filing covering the 2001-2002 legislative session, defendant lobbied on twenty-one bills and five administrative rules and spent $101,305 covering 987 hours of activity. Wis. Ethics Bd., Lobbying Effort by Organization, available at http://ethics.state.wi.us/scripts/2001Session/leoel2001.asp?PrinID=2709&start=V&start2=.[2]

---

[2]Pursuant to Fed. R. Evid. 201, I take judicial notice of defendant's Ethics Board filings, which are available at the Board's website (www.ethics.state.wi.us). See Palay v. United States, 349 F.3d 418, 425 n.5 (7th Cir. 2003) (stating that court may take judicial notice of matters of public record in resolving a motion to dismiss); Henson v. CSC Credit Servs., 29 F.3d 280, 284 (7th Cir. 1994 (same); see also Denius v. Dunlap, 330 F.3d 919, 926 (7th Cir. 2003) (stating that court may take judicial notice of information at government agency's website).

5

At the time that plaintiff commenced suit, approximately twenty of defendant's subsidiaries were registered to do business in Wisconsin. Defendant and the subsidiaries maintained a joint website providing information about products sold by the subsidiaries in Wisconsin. Defendant also administered the subsidiaries' employee benefit and stock option plans and combined the reports relating to such plans with its reports.

On August 7, 2000, defendant entered into a merger agreement with Northpoint, pursuant to which it agreed to contribute cash and assets including employees in return for a fifty-five percent interest in a new entity that would solely own Northpoint. Northpoint wished to restrict defendant's freedom to withdraw from the agreement because it feared that if defendant withdrew, it might be forced into bankruptcy. Thus, the agreement included a "material adverse effect" provision, which provided that defendant could opt out of the merger only under specified circumstances.

In the months following the announcement of the merger, plaintiff acquired beneficial ownership of Northpoint 12.875% Senior Notes valued at $9,276,020.25. The notes contained a "change of control" provision that required Northpoint to purchase the notes at a premium if a merger occurred. Defendant, as majority owner of the new entity that would own Northpoint, assumed this obligation pursuant to the merger agreement. (Compl. Ex. A at § 1.5.)

Plaintiff alleges that it purchased Northpoint notes based on defendant's statements to the press and filings with the Justice Department and Federal Trade Commission indicating that it intended to complete the merger by August 7, 2001. Plaintiff alleges that defendant's statements that it intended to complete the merger were false and that defendant secretly planned to opt out of the merger.

6

In September 2000, pursuant to the agreement, defendant purchased $150 million of Northpoint stock. However, in November 2000, defendant withdrew from the agreement citing the material adverse effect clause. Plaintiff alleges that defendant opted out of the merger in order to destroy Northpoint and usurp its business opportunities in the DSL field.

In early 2001, Northpoint collapsed, and according to plaintiff, defendant's DSL business increased dramatically.

Plaintiff ultimately sold its Northpoint stock at a loss of over $7 million.

### III. PERSONAL JURISDICTION

Fed. R. Civ. P. 12(b)(2) governs defendant's motion to dismiss for lack of personal jurisdiction. When a defendant brings a Rule 12(b)(2) motion, the plaintiff has the burden of proving personal jurisdiction. Dorf v. Ron March Co., 99 F. Supp. 2d 994, 996 (E.D. Wis. 2000). The burden, however, is not a heavy one. Johnson Worldwide Assoc., Inc. v. Brunton Co., 12 F. Supp. 2d 901, 906 (E.D. Wis. 1998). Plaintiff need only make a prima facie showing of the existence of personal jurisdiction.[3] Id. In determining whether personal jurisdiction exists, I may rely on the complaint, affidavits, deposition testimony, exhibits or other evidence in the record, Schimpf v. Gerald, Inc., 2 F. Supp. 2d 1150, 1160 (E.D. Wis. 1998), and I draw all inferences from the record in plaintiff's favor, PKWare, Inc. v. Meade, 79 F. Supp. 2d 1007, 1011 (E.D. Wis. 2000).

---

[3]If material facts are in dispute and the court holds an evidentiary hearing, the plaintiff must establish personal jurisdiction by a preponderance of the evidence. Purdue Research Found. v. Sanofi-Synthelabo, S.A., 338 F.3d 773, 782 (7th Cir. 2003). In the present case, however, material facts are not disputed, and I did not hold an evidentiary hearing.

7

In diversity cases, a federal court has personal jurisdiction over the parties only if a court in the state in which the federal court sits would have jurisdiction. See Fed. R. Civ. P. 4(e); see also Dorf, 99 F. Supp. 2d at 996. To determine whether I have personal jurisdiction, I first must decide whether defendant is subject to personal jurisdiction under Wisconsin's long-arm statute and, if so, whether exercising jurisdiction under the statute is consistent with the due process requirement of the Fourteenth Amendment. Id.

Under Wisconsin's long-arm statute, Wis. Stat. § 801.05, a Wisconsin court may exercise two types of jurisdiction over a non-resident defendant, specific jurisdiction and general jurisdiction. Specific jurisdiction exists when the litigation arises out of or is related to the defendant's contacts with Wisconsin. Wayne Pigment Corp. v. Halox, 220 F. Supp. 2d 931, 934 (E.D. Wis. 2002). General jurisdiction requires that a defendant have more substantial contacts with Wisconsin but authorizes a court to entertain any action against the defendant regardless of its subject matter. Id. at 933. In the present case, plaintiff argues that I have both specific and general jurisdiction over defendant. It is appropriate to determine whether an action arises out of or is related to a defendant's forum contacts before assessing the substantiality and quantity of the contacts. See Lea Brilmayer, et al., A General Look at General Jurisdiction, 66 Tex. L. Rev. 723, 736 (1988) [hereinafter "A General Look"]. Therefore, I address the question of specific jurisdiction before that of general jurisdiction.

**A.      Specific Jurisdiction**

Plaintiff argues that I have specific jurisdiction based on Wis. Stat. § 801.05(4), which confers jurisdiction over a defendant

in any action claiming injury to person or property within this state arising out of an act or omission outside this state by the defendant, provided in addition that at the time of the injury . . . (a) solicitation or service activities were carried on within this state by or on behalf of the defendant.

However, plaintiff's argument fails for several reasons. First, plaintiff does not satisfy the requirements of the statute because it does not identify an "injury to person or property within this state." Plaintiff is incorporated in the British Virgin Islands, and its complaint does not indicate that it is connected to Wisconsin. Although plaintiff asserts in its brief that it "is located in Wisconsin," (Pl.'s Mem. at 21), I find nothing in the record that supports this statement.

Second, even assuming that plaintiff satisfied § 801.05(4)(a), for a court to exercise specific jurisdiction over a lawsuit consistent with due process, "the action must <u>directly arise</u> out of the specific contacts between the defendant and the forum state." <u>RAR, Inc. v. Turner Diesel, Ltd.</u>, 107 F.3d 1272, 1278 (7th Cir. 1997) (citation omitted). In the present case, plaintiff presents no evidence that the action arises directly out of defendant's activities in Wisconsin. Thus, I may not exercise specific jurisdiction without violating defendant's right to due process.

## B.   General Jurisdiction

### 1.    Law and Rationale

Plaintiff argues that I have general jurisdiction based on Wis. Stat. § 801.05(1)(d), which confers jurisdiction over a defendant "in any action whether arising within or without this state, against a defendant who when the action is commenced is engaged in substantial and not isolated activities within this state whether such activities are wholly interstate, intrastate or otherwise." I construe the statute liberally in favor of the exercise

9

of jurisdiction. Johnson Worldwide, 21 F. Supp. 2d at 906. Section 801.05(1)(d) "contemplates a requirement similar to that of 'doing business' within the state which requires not just an isolated contact but 'substantial activities' which are 'continuous and systematic.'" Travelers Ins. Co. v. George McArthur & Sons, 25 Wis. 2d 197, 203 (1964). A defendant generally has "substantial and not isolated" contacts with the state if it "solicit[s], create[s], nurture[s], or maintain[s], whether through personal contacts or long-distance communications, a continuing business relationship with anyone in the state." Stauffacher v. Bennett, 969 F.2d 455, 457 (7th Cir. 1992). If the plaintiff establishes that the defendant's Wisconsin contacts are sufficient to satisfy the requirements of the statute, the court will presume that the exercise of general jurisdiction satisfies due process subject to the objecting defendant's opportunity to rebut. Kopke v. A. Hartrodt S.R.L., 245 Wis. 2d 396, 417 (2001).

The modern concept of general jurisdiction can be traced to International Shoe Co. v. Washington, 326 U.S. 310, 320 (1945), in which the court stated that a nonresident defendant's "continuous corporate operations within a state [may be] thought so substantial and of such a nature as to justify suit against it arising from dealings entirely distinct from those activities." Since then, however, the Supreme Court has addressed general jurisdiction in only a few cases and has never adopted a rationale for it or a framework for analyzing its propriety. See Charles W. "Rocky" Rhodes, The Predictability Principle in Personal Jurisdiction Doctrine: A Case Study On The Effects of a "Generally" Too Broad But "Specifically" Too Narrow Approach to Minimum Contacts, 57 Baylor L. Rev. 135, 218 (2005). Thus, I will briefly explore the theoretical underpinnings of the doctrine.

10

Scholars disagree about the justification for the doctrine of general jurisdiction based on continuous commercial activities. However, Professor Brilmayer advances one of the most persuasive rationales for the doctrine. Mary Twitchell, Why We Keep Doing Business with Doing-Business Jurisdiction, 2001 U. Chi. Legal F. 171, 173 (stating that Brilmayer's reciprocal benefits rationale is one of the most useful and widely-regarded justifications for allowing a state to exercise general jurisdiction over a non-resident defendant based on the defendant's commercial activities in the state). In her analysis, Brilmayer first asks why a state may exercise adjudicative power over individuals or entities who are domiciled, incorporated or have their principal place of business in that state. She suggests the principal reason is that such individuals or entities receive certain benefits as the result of their affiliation with the state, such that it is reasonable to allow the state to adjudicate lawsuits against them. Such benefits include, among others, the protection of the state's laws and, to a greater or lesser extent, the ability to influence state decision-making (in the case of domiciles by voting). Brilmayer, et al., A General Look, supra, at 726, 732-33. Brilmayer also argues that it is likely to be reasonably convenient to the parties, particularly the defendant, to litigate in a forum where the defendant is domiciled, incorporated or has its principal place of business. Id. at 730-31.

Brilmayer then argues that these same justifications – reciprocal benefits and convenience – support allowing a state to exercise general jurisdiction over a non-resident entity based on its commercial activity in the state. She asserts that such an entity should be held as broadly accountable in a state's courts as a local business. Thus, "the basic inquiry must be whether the defendant's level of activity rises to the level of activity of an insider, so that relegating the defendant to the political processes is fair." Id. at 742.

11

Further, a court should exercise general jurisdiction when a non-resident defendant's commercial activities are such that the defendant "is enough of an 'insider' that [it] may be safely relegated to the state's political processes." Lea Brilmayer, How Contacts Count: Due Process Limitations on State Court Jurisdiction, 1980 Sup. Ct. Rev. 77, 87.

Brilmayer's rationale is useful in several respects. First, her standard for determining when doing-business jurisdiction exists includes a meaningful yardstick that involves more than merely estimating whether a defendant's relationship to a forum is "systematic and continuous." Insiders are "those individuals and corporations that function within a state as if they were local." Sarah R. Cebik, "A Riddle Wrapped in a Mystery Inside an Enigma": General Personal Jurisdiction & Notions of Sovereignty, 1998 Ann. Surv. Am. L. 1, 31; see Dykes v. Reliable Furniture & Carpet, 3 Utah 2d 34, 37 (1954) (interpreting Utah "doing business" statute as requiring a "continuity of dealing and activity not too dissimilar from that indulged by local business people attending to their own business pursuits"); see also Charles W. "Rocky" Rhodes, Clarifying General Jurisdiction, 34 Seton Hall L. Rev. 807 (2004) [hereinafter "Clarifying"] (arguing that the minimum contacts necessary to establish general jurisdiction exist when the non-resident defendant is engaged in forum activities similar in quality and quantity to a local enterprise). In addition, one indicator of "insiderness," or, if you will, "localness," is participation in some fashion in public affairs in the forum. See Cebik, supra, at 31.

Brilmayer's theory of general jurisdiction is also useful because it identifies the relationship between the state and the defendant as being the important concern in limiting a state's authority to exercise general jurisdiction. A state may not exercise general

Case 2:03-cv-00703-LA   Filed 06/01/05   Page 12 of 34   Document 70

jurisdiction unless the non-resident defendant has, through its activities, created a relationship with the state such that it is fair to do so.  Id. at 28-31.

For these reasons, commentators have urged courts to explore Brilmayer's approach, see id. at 31 (suggesting that judges faced with hard cases draw on Brilmayer's concept when considering whether circumstances meet the minimum contacts test); see also Twitchell, supra, at 188 n.6 (recommending that courts work with the notion of insiderness).

### 2.  Analysis

#### a.  Wisconsin Statute

As stated, in determining whether I have general jurisdiction under § 801.05(1)(d), I ask whether defendant conducted "substantial activities" in Wisconsin and whether such activities were "continuous and systematic."  Travelers Ins. Co., 25 Wis. 2d at 203.  To satisfy the statute, plaintiff must show that defendant's Wisconsin activities were qualitatively "substantial" and quantitatively "continuous and systematic."  Id.  As previously discussed, in making these assessments, I compare the defendant's activities to those of a local business.

According to International Shoe Co., the quality of defendant's forum activities must be "of such a nature as to justify suit."  326 U.S. at 318.  International Shoe's "of such a nature" standard appears to contemplate activities of a particular type.  The Supreme Court subsequently confirmed this when it held that the standard was satisfied when a defendant operated a "limited . . . part of its general business" in the state.  Perkins v. Benguet Consol. Min. Co., 342 U.S. 437, 438 (1952).  Thus, in order to justify the exercise of

13

general jurisdiction, the defendant's forum activities must be the types of activities that are part of its general business. Therefore, a corporation must at least supervise the conduct of its business, produce goods or services, or carry out sales activities in a state before it may be considered to be doing business for general jurisdiction purposes. Rhodes, Clarifying, supra, at 888-89.

The fact that a defendant's in-state activities may be slight in comparison to its out-of-state business is immaterial as long as the defendant engages in substantial in-state business activity. See Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n, 819 F.2d 434, 437-38 (3d Cir. 1987). As a general rule, "we should not treat defendants as less amenable to suit merely because they carry on more substantial business in other states." Brilmayer et al., A General Look, supra, at 742. Further, a non-resident can conduct sufficient business to justify general jurisdiction without maintaining a business location in a state or acting through an in-state agent. See, e.g., Alderson v. Southern Co., 747 N.E. 2d 926 (Ill. App. Ct. 2001) (holding that an Indiana power company that sold a product to an Illinois corporation for use by Illinois residents pursuant to a transaction governed by Illinois law was subject to general jurisdiction in an Illinois court). However, a court should not impute the jurisdictional contacts of a subsidiary to a parent corporation unless the parent exerts an unreasonably high degree of control over the subsidiary. See Purdue Research, 338 F.3d at 788 n.17.

The "continuous and systematic" terminology indicates that the defendant's forum activities must be constant and occur at regular intervals. One commentator has suggested that the continuous and systematic requirement means that the defendant must conduct activities with a frequency that approximates at least some forum businesses. The

14

defendant need not conduct forum activities to such an extent that the state becomes its domicile or principal place of business; instead the comparison is whether the defendant's in-state activities are quantitatively equivalent to at least some local businesses. Rhodes, Clarifying, supra, at 894-95.

Thus, determining whether defendant engaged in sufficient activities in Wisconsin to satisfy § 801.05(1)(d) includes two inquiries – first an evaluation of the qualitative substantiality of defendant's activities, and second, a quantitative analysis of their continuity and regularity. In the present case, the qualitative and quantitative aspects of defendant's forum contacts are highly interrelated, and therefore, I will conduct the inquiries together. As explained below, defendant's Wisconsin activities were substantial in quality and systematic and continuous in quantity. In both respects, defendant's activities exceeded those of some, if not most, local businesses. To use Judge Posner's phrase, defendant established a "solid presence" in Wisconsin. Stauffacher, 969 F.2d at 457. Or, in Brilmayer's formulation based on its Wisconsin activities, defendant became enough of an insider in Wisconsin to justify treating it like a local business for purposes of general jurisdiction.

Defendant's business is raising capital by selling stock, and it actively conducted that business in Wisconsin. At the time plaintiff commenced suit, defendant had approximately 15,000 shareholders in Wisconsin, and it assiduously "solicit[ed] . . . a continuing business relationship with" each of them. Id. In the years prior to plaintiff's suit, at least four times a year defendant mailed each of its Wisconsin shareholders a solicitation asking them to buy more stock either by directly purchasing additional shares or by reinvesting their dividends. In addition, defendant maintained an interactive website

15

through which it sold stock to its Wisconsin shareholders and other Wisconsin residents. Defendant's efforts to sell stock in Wisconsin appear to have resulted in the sale of considerable stock. In addition, defendant promoted itself by engaging in quarterly conference calls with financial analysts and institutional investors including many from Wisconsin. During these calls, defendant discussed its quarterly earnings results and touted its value as a company.

Defendant also promoted itself in Wisconsin in other ways. Apart from its solicitations, defendant sent approximately six mailings a year to each of its Wisconsin shareholders. Defendant included in these mailings such materials as dividend checks, annual meeting packets, tax forms and information about itself. Defendant also communicated with and provided information to its Wisconsin shareholders through its website. In these ways also defendant "nurture[d] [and] maintain[ed] . . . a continuing business relationship with" them. Id. Defendant also communicated with other Wisconsin residents through its interactive website. Defendant also maintained a continuing business relationship with approximately 140 Wisconsin banks. In every quarter, defendant deposited approximately 1,400 dividend checks in such banks.

Defendant argues that for general jurisdiction purposes, I should treat its efforts to sell and its sales of stock in Wisconsin as less significant than sales activities involving more traditional consumer products, e.g., widgets. However, defendant advances no persuasive reason to do so, and I can think of none. In determining general jurisdiction, I inquire into the substantiality and continuity of defendant's Wisconsin activities. It is immaterial whether such activities involved stock, widgets or some other product.

16

Defendant also argues that in determining whether its Wisconsin activities were sufficient to establish general jurisdiction, I should either not consider or depreciate the significance of its promotional mailings and solicitations of its Wisconsin shareholders because it did not communicate with them "in any way other than through communications it sent to all shareholders." (Def.'s Reply Br. at 2.) However, as discussed, the fact that defendant also carried out promotional and solicitation activities in other states is immaterial.

Taken together, defendant's solicitations and sales of stock in Wisconsin, carried out through regular communications with its shareholders and through internet communications, its promotional activities carried out through the same means and through quarterly conference calls with financial analysts and institutional investors, and its regular deposits in Wisconsin banks amount to activities in Wisconsin that were both substantial in quality and continuous and systematic in quantity.[4] As previously stated, defendant's business is raising capital through the sale of stock, and the evidence indicates it operated a "limited . . . part of its general business" in Wisconsin. Perkins, 342 U.S. at 438. Also, many of defendant's communications with Wisconsin residents, whether shareholders or investors, were in the form of personal letters, faxes or telephone calls, all relatively high

---

[4]The fact that defendant has an interactive website is not in and of itself particularly significant for purposes of the general jurisdiction analysis. The focus remains on the quality and quantity of defendant's activities in Wisconsin not on whether defendant engaged in such activities via the internet or through more traditional means. See Symposium – Personal Jurisdiction in the Internet Age – Allan R. Stein, Personal Jurisdiction and the Internet: Seeing Due Process Through the Lens of Regulatory Precision, 98 Nw. U. L. Rev. 411, 436 (2004) (noting that with two exceptions courts have resisted finding general jurisdiction based solely on defendant's maintenance of website accessible from the forum).

17

quality forms of communication. See Dorf, 99 F. Supp. 2d at 997. Defendant also conducted the above activities continually and at regular intervals. Further, defendant carried out the above activities at a qualitative and quantitative level higher than that of many local businesses.

Other factors also support the exercise of general jurisdiction. Defendant is the successor to Verizon, Inc., which until 2000 was registered to do business in Wisconsin. Although such registration is a relatively minor factor in the jurisdictional calculus, it did not occur so long before the lawsuit that I may not consider it. See, e.g., Miller Brewing Co. v. Acme Process Equip. Co., 441 F. Supp. 520, 524 (E.D. Wis. 1977) (stating that a court may consider a defendant's prior activities in determining jurisdiction).

Of greater significance is the fact that defendant made it itself an insider in Wisconsin such that it is fair to relegate it to Wisconsin courts. In addition to engaging in commercial activities in Wisconsin, defendant litigated in Wisconsin courts, intervening in a lawsuit in Dane County. Further, defendant used its business relationships with Wisconsin residents to attempt to influence Wisconsin decision-makers. In one of its communications, defendant urged its Wisconsin shareholders to ask their representatives in Congress to vote for a measure that it supported. While defendant had a right to engage in such activity, its effort to influence public officials in Wisconsin considerably weakens its argument that it should not have to litigate before Wisconsin judges.

In assessing the substantiality and continuity of defendant's Wisconsin activities, I may also consider its lobbying activities. Lobbying activities are highly relevant to whether a non-resident defendant is in fact a forum insider. See Twitchell, supra, at 188 (stating that "lobbying activities within the forum should also be of some significance, since that is

18

one way that a corporate insider can influence local lawmaking" (citing Brilmayer, et al., A General Look, supra, at 742)). Several courts have held that the "government contacts" doctrine, a judicially-created rule originating in the District of Columbia that precludes a court from considering certain government contacts when determining personal jurisdiction, bars courts from considering a non-resident defendant's state lobbying activities when determining personal jurisdiction. See, e.g., Hollar v. Philip Morris Inc., 43 F. Supp. 2d 794, 801-02 n.6 (N.D. Ohio 1998). However, I find more persuasive such decisions as Chamberlain v. American Tobacco Co., No. 1-96 CV 2005, 1999 U.S. Dist. LEXIS 22636 (N.D. Ohio Nov. 19, 1999), and Maine v. Philip Morris, Inc., No. CV-97-134, 1998 Me. Super. Lexis 240 (Me. Super. Sept. 30, 1998), which hold that in the absence of a state statute to the contrary, the government contacts doctrine does not bar a court assessing personal jurisdiction from considering a non-resident defendant's state lobbying activities.

The principal rationale for the doctrine is the unique character of the District of Columbia as the seat of national government and the concern about converting the District into a national judicial forum. See, e.g., Envtl. Research Int'l, Inc. v. Lockwood Greene Eng'rs, Inc., 355 A.2d 808, 813 (D.C. 1976). For purposes of analyzing personal jurisdiction, however, there is a fundamental difference between undertaking lobbying activities before the federal government, which must be located in a jurisdiction, and undertaking lobbying activities before a state government. It makes sense to exclude a defendant's lobbying contacts with the federal government from a local court's personal jurisdiction analysis because when a defendant travels to the District of Columbia for purposes of petitioning the federal government, it intends to impact the federal government but not necessarily the forum itself. Chamberlain, 1999 U.S. Dist. LEXIS 22636, at *74-75.

19

In contrast, when a defendant lobbies a state legislature, which is charged with running the affairs of the state itself, the defendant necessarily intends to have an impact on the forum. Id. Thus, there is no reason to exclude consideration of a defendant's intentional contacts with a state.[5] Nor does the First Amendment require that courts exclude lobbying contacts with state governments when determining personal jurisdiction. In Calder v. Jones, 465 U.S. 783, 790 (1984), the Supreme Court unequivocally rejected "the suggestion that First Amendment concerns enter into the jurisdictional analysis," stating that "the infusion of such considerations would needlessly complicate an already imprecise inquiry."

Defendant's Ethics Board filings make clear that it, "Verizon Communications," not one of its subsidiaries, employed lobbyists to lobby concerning "[a]ll areas affecting the operation of Verizon and its subsidiaries," Wis. Ethics Bd., Organizations Employing L o b b y i s t s   i n   2 0 0 1 - 2 0 0 2 ,   a v a i l a b l e   a t http://ethics.state.wi.us/scripts/2001Session/OEL2001.asp?prinID=2709.    Defendant's filings further indicate that its contact-person regarding its lobbying activities was its state director of government affairs who worked out of an office near the state capitol, and that it spent considerable sums attempting to influence state government.   Defendant's lobbying activities made it a substantial presence in the Wisconsin capitol.  Further, its lobbying activities far exceeded those of most local businesses.  Thus, consideration of

---

[5]For this reason, the present case is distinguishable from Klinghoffer v. S.N.C. Achille Lauro, 937 F.2d 44 (2d Cir. 1991), which held that the plaintiff could not sue the PLO in New York based on its contacts with the United Nations.  For purposes of the government contracts doctrine, the PLO's contacts with the United Nations are similar to lobbying the federal government, not a state government.  This is so because when the PLO participates in the United Nations's affairs in New York, it does not intend to have any impact on the State of New York itself.  Chamberlain, 1999 U.S. Dist. LEXIS 22636, at *75 n.13.

20

defendant's lobbying activities reinforces my conclusion that defendant's Wisconsin activities satisfy the requirements of § 801.05(1)(d).

### b. Due Process

As previously stated, under Wisconsin law if a plaintiff establishes that a defendant's Wisconsin contacts satisfy the long-arm statute, the court will presume that the exercise of jurisdiction satisfies due process subject to the objecting defendant's opportunity to rebut. Kopke, 245 Wis. 2d at 416-17.[6] If the defendant attempts to rebut the presumption, the court makes a two-part inquiry to determine whether due process is satisfied. Id. at 417-18 (stating that in considering the due process issues, the court would employ the two-part inquiry articulated in Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985)). The court first asks whether the defendant "purposely established minimum contacts in the forum State." Id. at 417 (quoting Burger King, 471 U.S. at 474). On this question, the plaintiff bears the burden. Id. If the court answers the question affirmatively, then it may consider whether "in light of other factors . . . the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" Id. (quoting Burger King, 471 U.S. at 476 (quoting Int'l Shoe Co., 326 U.S. at 320)). On this question, the defendant carries the burden. Id. (stating that "[w]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the

---

[6]Like a number of states, Wisconsin uses a two-step process to analyze personal jurisdiction. However, its approach is unique in that its primary emphasis is on the statute instead of due process. Douglas D. McFarland, Dictum Run Wild: How Long-Arm Statutes Extended to the Limits of Due Process, 84 B.U. L. Rev. 491, 541 n.160 (2004). Wisconsin's statute represents an attempt to codify the rules regarding minimum contacts for personal jurisdiction established in International Shoe, thus compliance with a section of the statute is "prima facie compliance" with the due process requirements. Id.

21

presence of some other considerations would render jurisdiction unreasonable") (quoting Burger King, 471 U.S. at 477).[7]

I have already determined that plaintiff has established the minimum contacts necessary for general jurisdiction. Thus, plaintiff has satisfied the first component of the due process test. As stated, the second component of the due process limitation on the exercise of personal jurisdiction involves the court's evaluation of the contacts in light of other factors to determine whether the exercise of personal jurisdiction is "reasonable" under the circumstances of the particular case. See generally Walter W. Heiser, Toward Reasonable Limitations on the Exercise of General Jurisdiction, 41 San Diego L. Rev. 1035, 1040-41 (2004). In Asahi Metal Industry Co. v. Superior Court, 480 U.S. 102, 113 (1987), the Supreme Court identified the relevant factors as the burden on the defendant, the interest of the forum state, the plaintiff's interest in obtaining relief, the judicial system's interest in efficiency, and the shared interest of the states in furthering substantive social policies. In Asahi, the Supreme Court relied on these factors to hold that California's assertion of jurisdiction over a Japanese corporation involved in an indemnification dispute with a Taiwanese corporation in California state court "would be unreasonable and unfair," regardless of the defendant's forum contacts. Id. at 116.

---

[7]Prior to Kopke, the Wisconsin Supreme Court employed a five-factor test to determine whether the exercise of jurisdiction based on the long-arm statute satisfied due process. It considered the quantity of the defendant's contacts with the state, the nature and quality of the contacts, the source of the cause of action, Wisconsin's interest in the action, and convenience. However, in Kopke, the court discontinued its use of such factors, concluding that the test developed by the United States Supreme Court encompassed them. Kopke, 245 Wis. 2d at 418 n.9.

22

However, in the present case, I need not determine the effect, if any, of the Asahi factors because defendant does not argue that such factors would make the exercise of jurisdiction unreasonable. As previously stated, defendant carries the burden on the issue and "must present a compelling case that the presence of . . . other considerations would render jurisdiction unreasonable." Kopke, 245 Wis. 2d at 417 (quoting Burger King Corp., 471 U.S. at 477). In its briefs, defendant's only argument against the exercise of personal jurisdiction is a "minimum contacts" argument. Defendant does not argue that in the event that plaintiff establishes minimum contacts, I should nevertheless decline to exercise personal jurisdiction based on the reasonableness factors. Thus, defendant has waived such argument. See McKinney Restoration Co., Inc. v. Ill. Dist. Council No. 1 of the Int'l Union of Bricklayers and Allied Craftworkers, 392 F.3d 867, 872-73 (7th Cir. 2004) (stating that arguments not raised in district court are waived). In any case, by not addressing the issue, defendant has not met its burden of establishing that the exercise of personal jurisdiction would be unreasonable. Thus, I conclude that the exercise of general jurisdiction over defendant does not violate due process.[8]

For the foregoing reasons, I will deny defendant's Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction.

---

[8]Because I conclude that I may exercise general jurisdiction over defendant pursuant to Wis. Stat. § 801.05(1)(d), I need not consider plaintiff's argument that I have jurisdiction pursuant to Wis. Stat. § 551.65(2).

23

## IV.  SUFFICIENCY OF COMPLAINT

### A.    Standard of Review

A motion to dismiss made pursuant to Fed. R. Civ. P. 12(b)(6) should be granted only if the plaintiff can prove no set of facts that would entitle it to relief. GE Capital Corp. v. Lease Resolution Corp., 128 F.3d 1074, 1080 (7th Cir. 1997). The essence of a Rule 12(b)(6) motion is not that the plaintiff has pleaded insufficient facts; it is that even assuming all of its facts are accurate, it has no legal claim.    Payton v. Rush-Presbyterian-St. Luke's Med. Ctr., 184 F.3d 623, 627 (7th Cir. 1999). In considering a motion to dismiss, I must assume that all facts alleged in the complaint are true, and construe those facts and all reasonable inferences flowing from them in the light most favorable to the plaintiff. Bethlehem Steel Corp. v. Bush, 918 F.2d 1323, 1326 (7th Cir. 1990).

### B.    Applicable Substantive Law

In a diversity case, a federal district court applies the substantive law of the state in which it sits, Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938), including the state's choice of law rules.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941); see also Echo, Inc. v. Whitson Co., Inc., 52 F.3d 702, 717 (7th Cir. 1995).  Where neither party argues that the forum state's choice of law rules require the court to apply the substantive law of another state, the state should apply the forum state's substantive law.  Id.; see also Muslin v. Frelinghuysen Livestock Managers, Inc., 777 F.2d 1230, 1231 n.1 (7th Cir. 1985) (citing Casio, Inc. v. S.M. & R. Co., 755 F.2d 528, 530-31 (7th Cir. 1985)).  In Casio, the court stated that "[p]arties can within broad limits stipulate the substantive law to be applied to

24

their dispute." 755 F.2d at 531; see also Gonzales v. Volvo of Am. Corp., 752 F.2d 295, 299 (7th Cir. 1985) (stating that "where parties fail to raise a possible conflict of substantive laws, the better rule in our opinion, is that the substantive law of the forum controls").

In the present case, the parties agree that as the result of a choice of law provision in the merger agreement between defendant and Northpoint, Delaware law governs plaintiff's breach of contract claim. As to plaintiff's other claims, both parties treat Wisconsin law as applicable. Plaintiff alleges that defendant violated Wisconsin statutes and common law, and although defendant argues that plaintiff's claims fail, it does not dispute that Wisconsin law governs such claims. Thus, by not arguing that another jurisdiction's substantive law applies, the parties have acquiesced in the application of Wisconsin law.[9]

## C.     Plaintiff's Claims

Plaintiff alleges five misrepresentation claims, intentional misrepresentation, strict liability misrepresentation, negligent misrepresentation and claims under Wis. Stats. §§ 100.18 & 551.41, and a breach of contract claim. In all five of its misrepresentation claims, plaintiff alleges that defendant made false statements indicating that it intended to merge with Northpoint and false statements concerning its reasons for not merging. Before I address plaintiff's misrepresentation claims individually, I will consider two arguments that defendant directs to all of them.

––––––––––––––––––––––

[9]Because I do not find in the record any particular connection between the acts complained of and the State of Wisconsin, I am uncertain whether, in the absence of such acquiescence, Wisconsin law would apply. See, e.g., Emergency One, Inc. v. Waterous, Inc., 23 F. Supp. 2d 959, 968-70 (E.D. Wis. 1998) (discussing the concept of legislative jurisdiction); see also Brilmayer, et al., A General Look, supra, at 772-83.

First, defendant argues that I should not treat Northpoint's statements as defendant's because they cannot be "attributed to" defendant. See Wright v. Ernst & Young LLP, 152 F.3d 169, 175 (2d Cir. 1998) (applying federal securities law). However, plaintiff alleges that defendant and Northpoint agreed that neither would issue a statement without the other's approval and that they filed their agreement with the Securities Exchange Commission ("SEC"). Plaintiff also alleges that Northpoint's statements used the term "we," and thus indicated that defendant endorsed them. (Compl. ¶ 39, 42.) Taking plaintiff's allegations in the light most favorable to it, such allegations are sufficient to justify an inference that a purchaser of securities could have reasonably concluded that Northpoint spoke for defendant. Thus, at this stage of the litigation, I will attribute Northpoint's statements to defendant.

Second, defendant argues that I should disregard its statements concerning its reasons for not merging with Northpoint because plaintiff did not rely on such statements in purchasing the Northpoint notes. See Ollerman v. O'Rourke Co., Inc., 94 Wis. 2d 17, 25 (1980) (requiring a plaintiff to establish detrimental reliance to succeed on claims of intentional, negligent and strict liability misrepresentation); see also Carney v. Mantuano, 204 Wis. 2d 527 (Ct. App. 1996) (requiring a § 551.41 plaintiff to establish reliance); Valente v. Sofamor, S.N.C., 48 F. Supp. 2d 862 (E.D. Wis. 1999) (requiring a § 100.18 plaintiff to show reliance). Plaintiff responds that it relied on defendant's statements concerning its reasons for not merging when it sold the Northpoint notes at a loss. Although plaintiff's pleadings are largely silent on the matter, I cannot say at this point in the proceeding that plaintiff will be unable to prove that it sold the Northpoint notes in reliance on defendant's statements. See Sanjuan v. Am. Bd. of Psychiatry & Neurology,

26

Inc., 40 F.3d 247, 251 (7th Cir. 1994) (stating that "the plaintiff receives the benefit of the imagination, so long as the hypotheses are consistent with the complaint"). Thus, I will not disregard defendant's statements concerning its reasons for not merging with Northpoint.

I now turn to plaintiff's individual claims and defendant's arguments with respect to them. Under the Federal Rules, a plaintiff need only plead "a short and plain statement of the claim." Fed. R. Civ. P. 8(a)(2). A fraud plaintiff must state the circumstances underlying the fraud "with particularity," Fed. R. Civ. P. 9(b), but such higher pleading standard does not apply to averments of "intent." Id.

### 1. Intentional Misrepresentation

A plaintiff may establish intentional misrepresentation in one of several ways. If the plaintiff alleges that the defendant misrepresented a fact, the plaintiff must show that the defendant did so knowingly or recklessly and that it intended to deceive the plaintiff and induce it to act to its pecuniary disadvantage. The plaintiff must also show that it believed the representation and relied on it to its detriment. See Ollerman, 94 Wis. 2d at 25. If the plaintiff alleges that the defendant misrepresented an action that it would take in the future, the plaintiff must show that the defendant "knew of facts inconsistent with [its] statements or had a present intent not to perform." Schurmann v. Neau, 240 Wis. 2d 719, 727 (Ct. App. 2000).

Defendant argues that plaintiff's intentional misrepresentation claim fails on several grounds. First, defendant contends that plaintiff fails to adequately allege that defendant's statements that it intended to merge with Northpoint were false. The parties agree that defendant's statements concerning its intent to merge with Northpoint were predictions and that plaintiff must, therefore, allege that when defendant made the statements it had no

27

intent to perform. However, plaintiff satisfies such requirement because it alleges that "Verizon had no intent to perform," (Compl. ¶ 56), and that it concealed its "true intent." (Id. ¶ 6, ¶ 59.) In support of its argument, defendant cites Faulkner v. Verizon Communications, Inc., 156 F. Supp. 2d 384 (S.D.N.Y. 2001), and Faulkner v. Verizon Communications, Inc., 189 F. Supp. 2d 161 (S.D.N.Y. 2002), in which the court dismissed claims based on the statements at issue here. However, the Faulkner cases provide little guidance because they involved federal securities law claims subject to the heightened pleading requirements of the Private Securities Litigation Act ("PSLRA"). In the present case, plaintiff brings state law claims that are governed by the more liberal pleading standards identified above. Plaintiff also cites Arazie v. Mullane, 2 F.3d 1456 (7th Cir. 1993), and Gallagher v. Abbot Labs., 269 F.3d 806, 811 (7th Cir. 2001), but these cases are also of little value because they too involved federal securities law claims and a heightened pleading standard.[10]

Second, defendant argues that plaintiff fails to sufficiently allege that defendant intended to deceive plaintiff or to induce it to act in reliance on defendant's statements. However, plaintiff's pleading is sufficient because plaintiff alleges that "upon information and belief," defendant made the statements "with the intent to deceive and induce investors such as [plaintiff] to act upon the representations to their detriment." (Compl. ¶ 97.) See Syscon, Inc. v. Vehicle Valuation Servs., 274 F. Supp. 2d 975, 977 n.1 (N.D. Ill.

---

[10]Even prior to the enactment of the PSLRA, courts applied a heightened standard to pleading intent under federal securities laws. This was so because the 1934 Securities Exchange Act required that the "plaintiff plead a basis for believing that the requisite scienter existed." Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d § 1301.1. Such requirement was more demanding than that in Fed. R. Civ. P. 9(b), which allows intent to be "averred generally."

28

2003) (stating that allegations as to a defendant's intent based on information and belief satisfy liberal notice pleading standards).

Thus, I will deny defendant's motion to dismiss plaintiff's intentional misrepresentation claim.

### 2.    Wis. Stat. § 100.18

Plaintiff also alleges that by making false statements, defendant violated Wis. Stat. § 100.18.    Section 100.18 is a broad remedial statute prohibiting corporations from engaging in deceptive marketing practices by making "untrue, deceptive or misleading" representations.  Wis. Stat. § 100.18.  The elements of a § 100.18 claim are essentially the same as those of an intentional misrepresentation claim.

Defendant makes the same arguments against plaintiff's § 100.18 claim as it did against its intentional misrepresentation claim, and the arguments fail for the same reasons.  Plaintiff adequately pleads that defendant's statements that it intended to merge with Northpoint were false because it alleges that when defendant made the statements, it did not intend to complete the merger.  Plaintiff also adequately pleads that defendant made the statements with the intent to induce plaintiff to make a purchase because it alleges that defendant intended "to deceive and induce investors such as [plaintiff] to act upon the representations to their detriment."  (Compl. ¶ 97.)

Thus, I will deny defendant's motion to dismiss plaintiff's § 100.18 claim.

### 3.    Wis. Stat. § 551.41

Plaintiff also alleges that by making false representations, defendant violated Wis. Stat. § 551.41.  Section 551.41 is an anti-securities fraud statute, which prohibits sellers

29

of securities from making "untrue" statements. The elements of a claim under § 551.41 are essentially the same as those of an intentional misrepresentation claim.

Defendant argues that plaintiff's § 551.41 claim fails because plaintiff fails to adequately allege that defendant made a false statement. However, plaintiff's pleading is sufficient because plaintiff alleges that defendant stated that it intended to merge with Northpoint when in fact it had no intention to do so. (See Compl. ¶ 6, ¶ 56, ¶ 59.) Thus, I will deny defendant's motion to dismiss plaintiff's § 551.41 claim.

### 4. Negligent Misrepresentation

Plaintiff also alleges that by falsely stating that it intended to merge with Northpoint and by misrepresenting its reasons for not doing so, defendant committed the tort of negligent misrepresentation. To establish negligent misrepresentation, a plaintiff must prove that the defendant negligently misrepresented a fact while under a duty not to do so and that the plaintiff relied on the representation to its detriment. Ollerman, 94 Wis. 2d at 25. A plaintiff cannot base a negligent misrepresentation claim on statements of opinion or predictions about a future event. See Friends of Kenwood v. Green, 239 Wis. 2d 78, 86 (Ct. App. 2000) (stating that in the context of a claim for negligent misrepresentation, "ordinarily a prediction as to events to occur in the future is to be regarded as a statement of opinion only, on which the adverse party has no right to rely"); see also Badger Pharmacal, Inc. v. Colgate-Palmolive Co., 1 F.3d 621, 628 (7th Cir. 1993) (applying Wisconsin law and stating that if a party making promises "had a present intent not to perform them, the aggrieved party's claim would properly and logically be one for intentional misrepresentation . . . not one based on negligence").

30

Defendant argues that plaintiff's negligent misrepresentation claim fails because plaintiff does not allege that defendant made misrepresentations of fact. Defendant's alleged statements regarding its intention to merge with Northpoint are not statements of fact but predictions about the future. Thus, to the extent that plaintiff's claim is based on such statements, I will dismiss it. However, defendant's statements regarding its reasons for terminating the merger are statements of fact. See U.S. Oil Co., Inc. v. Midwest Auto Care Servs. Inc., 150 Wis.2d 80, 87 (Ct. App. 1989) (stating that "[s]tatements of fact must relate to present and pre-existing facts, not something to occur in the future"). Therefore, insofar as plaintiff's negligent misrepresentation claim is based on such statements, I will deny defendant's motion to dismiss.

Defendant also argues that plaintiff's negligent misrepresentation claim fails because plaintiff does not allege that defendant owed it a duty of care. However, "the essential function of a complaint under the civil rules . . . is to put the defendant on notice of the plaintiff's claim." Davis v. Ruby Foods, Inc., 269 F.3d 818, 820 (7th Cir. 2001). Thus, "[c]omplaints need not spell out every element of a legal theory; that's the big difference between notice pleading and code pleading." Hemenway v. Peabody Coal Co., 159 F.3d 255, 261 (7th Cir. 1998). In the present case, notwithstanding plaintiff's failure to allege that defendant owed it a duty, its allegations are sufficient to put defendant on notice of its negligent misrepresentation claim.

### 5.     Strict Liability Misrepresentation

Plaintiff also alleges that by falsely representing that it intended to merge with Northpoint and its reasons for not doing so, defendant committed strict liability misrepresentation. To establish strict liability misrepresentation, a plaintiff must show that

31

the defendant represented a fact that the defendant knew or should have known was untrue, that the defendant had an economic interest in the transaction, and that the plaintiff believed defendant's representation and relied on it to its detriment. Ollerman, 94 Wis. 2d at 25. Claims of strict liability misrepresentation commonly arise when a seller makes an unintentional misrepresentation in connection with the sale of property. The theory underlying the tort is that it is fairer to impose the loss resulting from the misrepresentation on the innocent defendant rather than on the innocent plaintiff. See, e.g., Van Lare v. Vogt, Inc., 274 Wis. 2d 631, 646 (2004); see also Harweger v. Wilcox, 16 Wis. 2d 526 (1962); Neas v. Siemens, 10 Wis. 2d 47 (1960). To establish the economic interest prong of a strict liability misrepresentation claim, the plaintiff must demonstrate that "defendant stood to make a financial gain" as the result of the plaintiff's participation in the transaction. See, e.g., Grube v. Daun, 173 Wis.2d 30, 69-70 (Ct. App. 1990). Plaintiff does not dispute that it could not show that defendant had such an interest. Therefore, I will dismiss plaintiff's strict liability misrepresentation claim.[11]

### 6. Breach of Contract

Plaintiff also alleges that by failing to go through with the merger, defendant breached its contract with Northpoint and that plaintiff was a third-party beneficiary of the contract and thus has standing to sue defendant for the breach. Defendant argues that plaintiff's claim fails because the contract between defendant and Northpoint barred claims

---

[11]To the extent that plaintiff's claim is based on defendant's statements that it intended to merge with Northpoint, I would also dismiss it because, as discussed, a prediction about the future is not actionable unless defendant had a present intent not to perform, and if defendant had such an intent, its false statement would have been intentional rather than innocent. See Badger Pharmacal, Inc., 1 F.3d at 628.

32

by third parties.  I may consider the language of the contract because plaintiff attached the contract to its complaint.  Witzke v. Femal, 376 F.3d 744, 749 (7th Cir. 2004).

As previously indicated, plaintiff's breach of contract claim is governed by Delaware law, which identifies three categories of third-party beneficiaries – donee beneficiaries, creditor beneficiaries and incidental beneficiaries.  Plaintiff claims to be a creditor beneficiary.  A creditor beneficiary may enforce a contract if the parties to the contract intended it to be able to do so.  See, e.g., Oliver B. Cannon & Son, Inc. v. Dorr-Oliver, Inc., 336 A.2d 211, 215 (Del. 1975).  In the present case, however, the agreement between defendant and Northpoint barred enforcement by third parties.  Section 10.7 entitled "Entire Agreement; No Third-Party Beneficiaries" provides that the agreement does not "confer upon any Person" other than the parties "any rights or remedies."  (Compl. Ex. A at § 10.7.) Thus, plaintiff may not proceed on its third-party beneficiary claim.  Ashton v. Pierce, 716 F.2d 56, 66 (D.C. Cir. 1983), in which the court found that a contract between the United States Department of Housing and Urban Development and the National Capitol Housing Authority was designed to benefit tenants of public housing and thus did not bar a third party action by the tenants, does not require a different result.  Ashton is distinguishable from the present case because there the court found that the parties did not clearly express an intent to bar third-party claims.  Therefore, I will dismiss plaintiff's breach of contract claim.

## V.  CONCLUSION

For the foregoing reasons,

33

**IT IS ORDERED** that defendant's motion to dismiss for lack of personal jurisdiction is **DENIED.**

**FURTHER, IT IS ORDERED** that defendant's motion to dismiss for failure to state a claim on which relief may be granted is **GRANTED IN PART** and **DENIED IN PART** as follows: defendant's motion to dismiss plaintiff's intentional misrepresentation claim is **DENIED**; defendant's motion to dismiss plaintiff's claim of a violation of Wis. Stat. § 100.18 is **DENIED**; defendant's motion to dismiss plaintiff's claim of a violation of Wis. Stat. § 551.41 is **DENIED**; defendant's motion to dismiss plaintiff's negligent misrepresentation claim is **GRANTED IN PART** and **DENIED IN PART**. Defendant's motion to dismiss is granted insofar as it is directed to defendant's statements concerning its intent to complete the merger and denied insofar as it is directed to defendant's statements concerning its reasons for terminating the merger; defendant's motion to dismiss plaintiff's strict liability misrepresentation claim is **GRANTED**; and defendant's motion to dismiss plaintiff's breach of contract claim is **GRANTED**.

**FINALLY, IT IS ORDERED** that a telephonic Rule 16(b) scheduling conference will be held on **July 7, 2005 at 11:00 a.m.** The court will initiate the call.

Dated at Milwaukee, Wisconsin, this 1 day of June, 2005.


/s_____
LYNN ADELMAN
District Judge

34